# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

William Soto,

    Plaintiff

v.

Aria Resort and Casino, LLC, et al.,

    Defendants

2:16-cv-00064-JAD-PAL

**Order re: Summary Judgment**

**[ECF Nos. 87, 88, 89]**

    Plaintiff William Soto was fired from his job as a security officer at the Aria Resort and Casino after an internal investigation revealed that he was extorting a patron for money in exchange for his promise not to have her arrested for trespass. Soto sues that patron, Aria, and the Aria employees involved in the investigation, claiming that their accusations were false and defamatory, interfered with his employment relationship, and violated Nevada's anti-wiretapping law. Defendants move for summary judgment, arguing that all admissible evidence proves that the allegations against Soto were true, and Soto's repeated denial under oath that the recorded caller was him precludes his wiretapping claim. I agree, so I grant the motions[1] and enter judgment in defendants' favor.

## Background

    William Soto was hired to work as a security officer at Aria in 2009 and promoted to undercover security investigator in 2013.[2] One of Soto's main duties was to deter unlawful activity at Aria and oust individuals suspected of solicitation and prostitution.[3] According to Soto, in the late hours of February 23, 2015, defendant Melanie Saljougui offered him a "private show plus

---

[1] ECF Nos. 88, 89.

[2] ECF Nos. 92-1 at 2 (Soto depo.); and 66 (personnel action notice).

[3] *Id.* at 8.

Page 1

something extra for $2,000."[4] Soto presented his security badge to Saljougui and escorted her to the security office for processing.[5] While searching her purse for weapons, he found one of her business cards that listed her contact information and revealed that she was a real estate agent.[6]

Soto checked Aria's computer system and learned that Saljougui had no criminal record and that she had never been trespassed from any affiliated property.[7] He then proceeded to "screw with [Saljougui's] head" and told her she was "going to go to jail, even when she was crying."[8] When Saljougui asked him what he was going to do, he replied that he "let her think she was going to go to jail and she'd sit there and cry. Then she asked [him] . . . how do we get this lifted, can I get this lifted."[9] Soto "explained to her, look, this is what happened, this is what we talked about" before escorting Saljougui to her car at approximately 2:40 a.m.[10]

Later that morning, Yong Hoon Lee, an assistant manager of security at Aria, received a call from Lance Martinez, a manager of the Alibi Lounge inside Aria, stating that someone had complained to him about an incident earlier that evening with a security officer matching Soto's physical description.[11] Martinez informed Lee that a woman—later identified as Saljougui—provided him with text messages and an audio recording of a conversation that she had with someone (whom she believed was the Aria security officer that had ousted her) who was trying to get money from her in exchange for her not going to jail.[12] Martinez played the audio recording for Lee,

---

[4] *Id.* at 23.

[5] *Id.*

[6] *Id.* at 23–25.

[7] *Id.* at 24–25.

[8] ECF No. 92-2 at 57 (audio recording of Soto's disciplinary interview with Lee and Hedrick).

[9] *Id.*

[10] ECF No. 92-1 at 83 (Aria incident report); and 85–86 (Aria trespass warning).

[11] ECF No. 92-2 at 3–4 (Lee depo.).

[12] Although Saljougui did not identify the security officer who trespassed her from the property by name until after being served with this lawsuit, to avoid confusion, I refer to Soto by name throughout the rest of the order.

who "immediately notice[d] that the male in the conversation was Mr. Soto's voice."[13] Martinez provided copies of the text messages and the audio recording to Lee, who then reported the incident to his superiors.[14]

The next day, Lee and Jerald Hedrick (the investigations manager and Soto's direct supervisor at Aria) met with Saljougui to gather more information about the incident.[15] She claimed that Soto asked her what she would do for him while they were walking towards the security office and she replied that she would pay whatever fine or ticket necessary to prevent going to jail and to prevent the incident from going on her criminal record.[16] Saljougui reported that once she and Soto were in the security office, Soto went through her purse and took one of her business cards that listed her cell phone number and email address.[17] Soto escorted her to her car and, once they were out of view of the cameras, Soto told her that he had a year to report the trespass to the police and that she could avoid going to jail if she paid him $400.[18] Soto then told her that he would call her the next day at 8:00 p.m. to arrange a handoff of the money.[19]

Saljougui showed Lee and Hedrick emails, texts, and a log of missed calls on her phone that she received after being trespassed, including an email she received stating in the subject line "[w]e need to talk" and directing her to "text 415-484-06**."[20] Saljougui also played the telephone conversation she recorded with the person she believed was Soto, and Hedrick agreed that the voice on the recording belonged to Soto.[21] Lee and Hedrick then helped Saljougui coordinate a handoff of

---

[13] ECF No. 92-2 at 8 (Lee depo.).

[14] *Id.* at 9.

[15] *Id.* at 10–13.

[16] *Id.* at 25 (audio recording of Hedrick and Lee's interview with Saljougui).

[17] *Id.*; ECF No. 92-1 at 73 (Saljougui depo.); ECF No. 92-2 at 27 (Saljougui's business card).

[18] *Id.* at 25 (Hedrick and Lee's interview with Saljougui); ECF No. 92-1 at 75 (Saljougui depo.).

[19] *Id.*; ECF No. 92-1 at 73–75 (Saljougui depo.).

[20] *Id.* at 25, 29, 31, 80 (Saljougui depo.).

[21] *Id.* at 58–59 (Hedrick depo.).

the money by sending text messages to 415-484-06** from Saljougui's phone and providing surveillance at the agreed-upon drop-off point. Throughout the day, Saljougui received numerous text messages from 415-484-06** attempting to coordinate the handoff, but the handoff ultimately failed because Saljougui refused to drop the envelope of money out of her car window behind a Bank of America building because she feared that someone else would pick the money up.[22] Saljougui then received a final text message from 415-484-06** at 7:26 p.m., stating "good bye we are done."[23] Lee and Hedrick then stopped their surveillance and went back to Aria, where they called Soto in to discuss the allegations that had been made against him.[24]

Soto admitted that he knew Saljougui from trespassing her off of Aria's property,[25] that he had seen her business cards in her purse when he was processing her in the office, and that he had led her to believe she would go to jail while he was processing her trespassing paperwork.[26] Soto also admitted telling Saljougui that the trespass would last a year, but he repeatedly denied having any further contact after trespassing her from Aria and he specifically denied calling, texting, or emailing her.[27] Soto was suspended pending further investigation.[28]

As part of the investigation, Hedrick and Lee also interviewed Soto's investigative partner, Robert Fishbourne, who told Lee and Hedrick that Soto had been sending text messages to a woman who he had seen Soto with previously that had an accent and long black hair.[29] Fishbourne said that

---

[22] ECF No. 92-2 at 42–50 (screen shots of text messages between Saljougui and 415-484-06**); *id.* at 54–55 (Hedrick email outlining sequence of events between Saljougui and 415-484-06**).

[23] *Id.* at 50.

[24] ECF No. 92-1 at 29–30 (Soto depo.); ECF No 92-2 at 57 (Soto's disciplinary interview with Lee and Hedrick).

[25] *Id.* at 31; ECF No 92-2 at 57.

[26] *Id.*; ECF No 92-2 at 57.

[27] *Id.* at 10, 27–29 (Soto depo.); 92-3 at 8 (audio recording of Soto's sworn testimony at his unemployment hearing).

[28] *Id.*; ECF 92-2 at 59 (suspension letter).

[29] ECF No. 92-2 at 61–63 (Fishbourne statement); according to Hedrick, Saljougui has a French accent and black hair (ECF No. 92-1 at 57).

Soto was sending the text messages via a Google application that changed the phone number that the text message originated from the recipient's phone.[30] Fishbourne stated that Soto had used this application at least seven times to contact women he had trespassed from Aria that had no trespass or solicitation records.[31]

Soto was afforded a due-process meeting with Hedrick and Todd Owen, Aria's former employee relations manager, as part of the disciplinary investigation. According to Owen, during the meeting, Soto admitted using a second phone number generated by a Google application to contact women suspected of prostitution, but denied doing so with Saljougui.[32] And when Soto was made aware of the audio recording that Saljougui had made of the conversation she had with the person who was demanding money from her, Soto stated that even if it was clear from the recording that it was his voice on the call, he would deny that it was him.[33] Owen listened to the recording and had "no doubts" and was "absolutely 100 percent confident" that the voice on the recorded call is Soto's.[34]

In March 2015, Soto's employment at Aria was terminated for misconduct and undesirable activity.[35] In his unemployment proceedings with the Nevada Department of Employment Training and Rehabilitation, Soto offered sworn testimony about the events that led to his termination.[36] Soto repeatedly stated during the hearings that he never had any contact with Saljougui after he trespassed her.[37] The appeals referee was unable to find by a preponderance of the evidence that Soto had

---

[30] *Id.*

[31] *Id.*

[32] *Id.* at 65 (Owen separation-synopsis email); and 74–75 (Owen depo.).

[33] *Id.* at 76 (Owen depo.).

[34] *Id.* at 78.

[35] *Id.* at 65–67 (Owen's separation synopsis).

[36] ECF No. 92-3 at 2, 8 (audio recordings of Soto's unemployment hearing).

[37] *Id.*

engaged in "willful or deliberate misconduct."[38] That decision also states, "it is important to note that [] Saljougui did not appear for the hearing and could not be cross-examined."[39]

Soto then filed this action. He sues Saljougui; Aria; Aria employees Lee, Hedrick, Fishbourne, and Owen; and Philippe Rouas, a "possible ear witness" to Soto's recorded phone call to Saljougui.[40] Soto alleges claims for: (1) defamation per se against all defendants; (2) slander per se against Owen; (3) civil conspiracy against Saljougui, Lee, Hedrick, Fishbourne, Owen, and Rouas; (4) intentional interference with prospective economic advantage against Saljougui, Lee, Hedrick, Fishbourne, Owen, and Rouas; and (5) attempting to intercept a wire communication in violation of Nevada's anti-wiretapping statute, NRS § 200.620, against Saljougui.[41] Though Rouas was given an extension of time to answer Soto's complaint,[42] he never did. The Aria defendants and Saljougui now move for summary judgment on all claims against them.[43]

## Discussion

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[44] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[45] If reasonable minds could differ on material facts,

---

[38] *Id.*

[39] *Id.*

[40] ECF No. 44 (amended complaint) at ¶ 22.

[41] *Id*. at 17–20.

[42] ECF No. 95 (extending deadline to answer to 1/11/17). Rouas's attorney withdrew shortly after that deadline passed. *See* ECF No. 96

[43] ECF Nos. 88, 92 (Aria defendants), 89 (Saljougui). Because the Aria defendants filed a Notice of Corrected image at ECF No. 92, all citations to their motion for summary judgment are to the corrected image at ECF No. 92. The Aria defendants also moved for permission to exceed the page limit. ECF No. 87. But their motion falls within the 30-page limit, so I deny the motion [ECF No. 87] as moot.

[44] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[45] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

Page 6

summary judgment is inappropriate because summary judgment's purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[46]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[47] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[48]

**A. Because defendants establish that Saljougui's allegations against Soto are true or substantially true, the defamation element at the core of Soto's first four claims fails.**

Soto alleges in his first claim that defendants defamed him by telling "one or more persons, orally and/or in writing," that he was "extorting and/or blackmailing prostitutes."[49] Soto alleges in his second claim that Owen committed slander by making written defamatory statements in his reports accusing him of extortion.[50] Soto's third and fourth claims for civil conspiracy and intentional interference with prospective economic advantage assert that defendants "agree[d] to participate in a conspiracy to have him terminated from his position with defendant Aria" by defaming him, thereby causing him economic harm.[51] All of these claims thus turn on whether defamation occurred.

Defendants argue that all of these claims fail as a matter of law because: (1) the statements Soto claims are defamatory are true; and (2) Soto cannot demonstrate unprivileged publication to

---

[46] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[47] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[48] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

[49] ECF No. 44 at 17.

[50] *Id.* at 18.

[51] *Id.* at 19–20.

Page 7

third parties because he testified that none of the allegedly false statements were made outside the unemployment hearing or the context of Aria's investigations and, therefore, all the statements at issue are privileged intra-corporate communications.[52]

In Nevada, "the general elements of a defamation claim require a plaintiff to prove: '(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.'"[53] "Truth is an absolute defense to defamation."[54]

In support of their truth defense, defendants submit subpoenaed internet protocol ("IP") records from Cox Communications, which indicate that the email Saljougui received directing her to "text 415-484-06**"[55] was sent from Soto's home.[56] Defendants also offer Saljougui's phone records that are replete with incoming and outgoing messages between Saljougui and 415-484-06**, plus screen shots of text messages between Saljougui and 415-484-06** attempting to schedule a meeting for her to deliver the money.[57] The time and date stamps on the text-message screen shots match the times and dates on Saljougui's phone records. Defendants also provide a copy of the recorded conversation that Saljougui had with the person who was trying to get money from her—whom Lee, Owen, Fishbourne, and Hedrick all testified was Soto.

Soto responds by first attempting to cast doubt on the authenticity of the IP records submitted by defendants, asserting that the metadata was in HTML format and "[a]ny piece of information in the metadata can easily be edited, if one wanted to do so."[58] I find this argument unpersuasive

---

[52] ECF No. 92 at 20; ECF No. 89 at 3–4.

[53] *Flowers v. Carville*, 266 F. Supp. 2d 1245, 1251 (D. Nev. 2003) (quoting *Pegasus v. Reno Newspapers*, 57 P.3d 82, 90 (Nev. 2002).

[54] *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1108, 1131 (D. Nev. 2014); *Pegasus*, 57 P.3d at 88 ("Nor is a statement defamatory if it is absolutely true, or substantially true").

[55] The last two numbers are obscured in this order for privacy purposes.

[56] ECF No. 92-2 at 35–40 (Saljougui's cell phone records).

[57] ECF No. 92-2 at 42–50 (screen shots of text messages).

[58] ECF No. 101 at 3.

because merely raising the specter of evidence tampering is not sufficient at this stage. Further, Soto states later in his response that "the IP address returned to [his] wife's name, **who at the time was [his] fiancee and living with [him]**."[59] So Soto admits that the email originated from his home.

Soto next argues that "there is no evidence that [he] specifically sent out that email" because "there is no email address in the metadata that is linked to [him] . . . specifically."[60] Soto also argues that "[t]he text messages that defendant Saljougui claims are between [him] and her have no confirmed origin. There was no match to a specific owner, . . . [nor] evidence pointing to me being involved in a text conversation with defendant Saljougui."[61] I am unpersuaded by these arguments. The email directing Saljougui to text 415-484-06** came from Soto's home. Soto stated in his opposition that "[a]t the time of this incident, [he] had a fiancee and small child,"[62] but he presents no evidence or argument that either of them sent the email to Saljougui. Thus, Soto fails to cast even a metaphysical doubt on the fact that he sent the email to Saljougui directing her to contact 415-484-06**, the number that appeared repeatedly on Saljougui's phone bill with time and date stamps that match the time and date stamps on the text-message screen shots that the Aria defendants provide.

Next, Soto contends that whether he was the person on the recorded telephone conversation with Saljougui is genuinely disputed.[63] He submits an unsworn report from a "topic expert," George Papcun, Ph.D., for the proposition that the pitch contours of Soto's voice and the pitch contours of the male in the audio recording are unlikely to be from the same person.[64] A party opposing summary judgment may rely on expert testimony to create a genuine issue of material fact, but Soto failed to authenticate Dr. Papcun's report by affidavit or otherwise. Unsworn expert reports are

---

[59] *Id.* (emphasis supplied).

[60] *Id.*

[61] *Id.* at 4.

[62] *Id.*

[63] *Id.*

[64] *Id.* (citing ECF No. 101 at 15 (Dr. Papcun's report)).

Page 9

hearsay and cannot create a triable issue of fact to preclude summary judgment.[65]

Saljougui also challenges Papcun's opinions under *Daubert* and FRE 702 because Papcun's opinion was not given to "a reasonable degree of certainty in the stated field."[66] But the Nevada Supreme Court explained in *FCH1, LLC v. Rodriguez*,[67] that the magic words "to a reasonable degree of certainty" are not required of all experts; "the 'standard for admissibility varies depending upon the expert opinion's nature and purpose.'"[68] Instead, the court must consider "the purpose of the expert testimony and its certainty in light of its context."[69] And if the expert offers "a definitive opinion based on research and expertise," it is likely not excludable as speculation.[70]

Had Soto validated Papcun's report with an affidavit so that I could consider it on summary judgment, I would not have excluded it for want of the magic words "reasonable degree of certainty." But I would exclude it because it appears too speculative. Papcun's report does not reveal what Papcun bases his opinions on. Unlike the expert in *FCH1,* Papcun does not state in his report that "he based his opinion on his years of experience" in a relevant field or on research of any kind.[71] In short, Soto has failed to offer any information about Papcun's qualifications or the reliability of his methodology.[72] So I decline to consider Papcun's unsworn report in determining whether there is a genuine evidentiary dispute about whose voice is on the recorded call.

Finally, Soto suggests that the conclusion by the appeals referee at his unemployment hearing

---

[65] *See Liebling v. Novartis Pharm. Corp.* 2014 WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014) (collecting cases for the proposition that "it is well established that unsworn expert reports are inadmissible and cannot be used to create a triable issue of fact for purposes of summary judgment").

[66] ECF No. 107.

[67] *FCH1, LLC v. Rodriguez*, 335 P.3d 183, 188 (Nev. 2014).

[68] *Id*. (quoting *Morsicato v. Sav-On Drug Stores, Inc.*, 111 P.3d 1112, 1115 (2005)).

[69] *Id*.

[70] *Id*.

[71] *Compare id*. *with* ECF No. 101 at 9–15 (Papcun report).

[72] *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999) ("Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case").

that there was not a preponderance of evidence that Soto had engaged in "willful or deliberate misconduct"[73] precludes summary judgment. In reaching his decision, the referee noted that Saljougui was not available to be cross-examined;[74] the referee lacked access to the subpoenaed IP records linking the email coming from Soto's house to the text messages sent to Saljougui for the purposes of coordinating the money drop; and the unemployment hearing proceeded on different evidentiary rules and standards than we apply here. "Evidence introduced at an unemployment benefits hearing should, presumably, be admitted in a later lawsuit, subject to the normal rules governing admissibility. But . . . an unemployment hearing officer's decision, . . . normally should not be" because these hearings are "designed to be quick and inexpensive."[75] I find no reason to depart from this normal practice here, so I do not consider the hearing officer's decision in determining whether there is a genuine issue of fact that precludes summary judgment.

When I view all non-excluded facts and draw all inferences in the light most favorable to Soto, I find that reasonable minds could not disagree that Soto sent the extortionate email and text messages to Saljougui, so Soto cannot establish that he was defamed. Because Soto has failed to meet his burden to show a genuine dispute as to any material fact, I grant defendants' motions for summary judgment on Soto's claims for defamation, slander, civil conspiracy, and intentional interference with prospective economic advantage.[76]

**B.     Saljougui is entitled to summary judgment on Soto's wiretapping claim.**

As his final claim, Soto alleges that Saljougui violated Nevada's anti-wiretapping law, NRS § 200.620, by recording a phone conversation that took place between Saljougui and a person she identified as him, without first seeking his authorization to record the call.[77] NRS § 200.620 makes

---

[73] *Id.*

[74] *Id.*

[75] *Bradshaw v. Golden Road Motor Inn*, 885 F. Supp. 1370, 1375 (D. Nev. 1995).

[76] The Aria defendants also argue that Soto's claims should be dismissed because Soto committed perjury by repeatedly insisting that he did not have any contact with Saljougui. Because I grant the Aria defendants' summary-judgment motion on other reasons, I do not reach this argument.

[77] ECF No. 44 at ¶ 83.

it unlawful for any person to "intercept or attempt to intercept any wire communication unless: (a) [t]he interception or attempted interception is made with the prior consent of one of the parties to the communication; and (b) an emergency situation exists and it is impractical to obtain a court order . . . before the interception."[78] Saljougui seeks summary judgment on this claim on two bases: (1) Soto has consistently denied under oath that he was a party to this call and, therefore, lacks standing to bring a claim under NRS § 200.620; and (2) NRS § 200.620 applies only to "wire communications" and the call that was recorded here was a wireless call between two cellular phones.

Because I find that summary judgment is proper on Saljougui's first argument, I do not reach the second. Soto has repeatedly sworn under oath that he did not have any contact with Saljougui after he trespassed her from the property. He expressly stated at his deposition that he did not contact her by phone.[79] He maintains this position in his response to the summary judgment motions by reiterating that he "stand[s] firm on everything [he] ha[s] said under oath."[80] Because Soto maintains that he was not on the call that Saljougui recorded, he cannot prove that he is one of the parties to this call. Accordingly, I find that Soto lacks standing to bring a claim under NRS § 200.620, and I grant summary judgment in favor of Saljougui on Soto's fifth cause of action.

**C.    Soto must take action on his claims against Rouas or they will be dismissed.**

The entry of summary judgment on all claims against Saljougui and the Aria defendants leaves only Soto's claims against Philippe Rouas. Rouas has failed to answer or otherwise respond to the complaint, despite a court-granted extension of time, and both Rouas and Soto are now

---

[78] Nev. Rev. Stat. § 200.620.

[79] *See* ECF No. 92-1 at 27–28 (Soto depo) ("Q. Okay. So after you trespassed Ms. Saljougui from property, did you have any more contact with her? A. No. Q. You never had any other contact with Ms. Saljougui? A. No." "Q. You never contacted her by . . . telephone? A. No." "Q. May I remind you that you're under oath. A. I understand."); at 29 ("Q. Okay. So when do you next become aware of Ms. Saljougui? Because if I understood—and, again, correct me if I'm wrong—after you trespassed her and escorted her to the parking garage, you never had any contact with her physically, electronically, by phone, email, text, or otherwise; correct? A. Correct."); ECF No. 92-3 at 8 (audio recording of Soto's sworn testimony at his unemployment hearing).

[80] ECF No. 101 at 5.

proceeding without counsel.[81] If Soto does not obtain a clerk's entry of default against Rouas and file a motion for default judgment by September 13, 2017, the court will dismiss all remaining claims without prejudice for failure to prosecute them and close this case.

### Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendants' motions for summary judgment **[ECF Nos. 88, 89] are GRANTED**, and the Clerk of Court is directed to **enter judgment in favor of defendants Aria Resort and Casino, LLC, Yong Hoon Lee, Jerald Hedrick, Robert Fishbourne, Todd Owens, and Melanie Saljougui on all of Soto's claims**, leaving only Soto's claims against Philippe Rouas remaining. Soto has until September 13, 2017, to obtain default against Rouas and move for a default judgment; if he fails to do so by this deadline, all remaining claims will be dismissed without prejudice and this case will be closed without further notice.

IT IS FURTHER ORDERED that the Aria defendants' motion to exceed the page limit for their motion for summary judgment **[ECF No. 87] is DENIED**.

DATED August 23, 2017.

Jennifer A. Dorsey
United States District Judge

---

[81] *See* ECF Nos. 95, 96, 99.